529 So.2d 799 (1988)
SECURITY AND INVESTMENT CORPORATION OF THE PALM BEACHES, Appellant,
v.
Edward James DROEGE, Carlene Droege, His Wife, Orr Woodworks, Inc., a Florida Corporation, Orr Industries, Inc., a Florida Corporation, Gheorghe Sziics, Andy Christiansen, and Louis Green, Appellees.
No. 87-1423.
District Court of Appeal of Florida, Fourth District.
August 10, 1988.
Larry Klein of Klein & Beranek, P.A., and Stierer Amendola Kaplan & Hyman, West Palm Beach, for appellant.
*800 John L. Avery, Jr., Jupiter, for appellees-Droeges.
SHARP, WINIFRED J., Associate Judge.
Security and Investment Corporation appeals from a final judgment which denied it any remedy in its suit to foreclose a mortgage or establish an equitable lien on real estate belonging to Edward Droege and the estate of his deceased wife, Carlene. In a prior appeal to this court, we held that the Droeges were entitled to assert any defenses to the note and mortgage as to Security, which were available to them against the original mortgagees, Sziics and Christiansen, because Security was not a holder in due course.[1]
Security argues that the Droeges elected their remedy when they recovered a $49,705.90 judgment against Christiansen in the first foreclosure case, and then satisfied it for a payment of $25,000 in cash. Although the election of remedies argument appears superficially convincing, after digging into the facts and circumstances of this case, we hold that the doctrine is neither applicable, nor appropriate to bar the Droeges' defenses to this foreclosure suit, and we affirm the result reached below.
The records of both foreclosure suits establish the sad tale of how naive landowners who rely upon a "friend" to build them a home at an unusually low price, can be severely damaged, both economically and personally.[2] In 1981, the Droeges decided to build a home on a lot they owned, which then was worth $16,000. They discussed prices to build the home of their choice with another contractor. Sziics, an acquaintance of theirs who lived nearby, told them he could build the house for much less money, and much quicker.
Sziics introduced the Droeges to Christiansen, who Sziics said was his partner. In fact, Christiansen was never Sziics' partner. He was a "handy-man" who worked in his wife's motel business in New York state, and for whom Sziics was also building a home nearby in Florida. Christiansen signed the construction contract with Sziics for the sole purpose of assuring that Sziics would employ and train Christiansen's son on the Droeges' construction job, and in the hope of allowing Sziics to get a lower price on purchases of lumber and materials for his and the Droeges' houses by ordering for both at the same time. Neither Sziics nor Christiansen were licensed general contractors, although the Droeges did not know enough at that point, to inquire.
The building contract was prepared by Sziics' attorney in April of 1981. The Droeges did not have legal counsel. The contract provided that Sziics and Christiansen would build a home for the Droeges on their lot for a total of $85,000. The Droeges were to pay $30,000 at various stages of construction, to the point of having the roof "dried-in" and the outer walls erected. They immediately handed over to Sziics $31,000 in cash, and Christiansen left to work in New York state.
Pursuant to the construction contract, the contractor agreed to complete the house within one hundred seventy days of commencement. The Droeges agreed to execute a promissory note for $55,000, secured by a mortgage on their lot and house, to finance the balance of the contract price. The construction agreement also provided that the note would be payable in equal monthly installments over a twenty-five year period, but with a balloon payment at the end of sixty months "after completion of the building and delivery of the certificate of occupancy."
Within less than two weeks after signing the construction contract, the attorney representing Sziics had the Droeges return to his office to execute a note and mortgage. Sziics and Christiansen were the mortgagees *801 and the Droeges paid monies for title insurance and document preparation. Again the Droeges were not represented by legal counsel.
On April 15, 1981, Sziics and Christiansen assigned the mortgage note and deed to Peoples Mortgage Company. On December 10, 1981, Peoples assigned the documents to Security. There is adequate proof in the record that both Peoples and Security are companies controlled and managed by Willis Mall, and that Mall knew at the time of both assignments that the Droeges' house was incomplete and that the $55,000 provided for in the mortgage note had not been funded.
At the time of the assignment from Sziics and Christiansen to Peoples, $23,650.58 was advanced to Sziics, but no showing was made that any of those funds were used by Sziics for the Droege house. Later when Peoples assigned the mortgage to Security, of the $44,685 advanced to, or on account of Sziics, only $9,977.59 actually was applied to the Droege project. The balance was used to pay off other loans to Sziics, or other contractors or other building projects. Mall admitted that at that time, he did not think Sziics could complete the Droege house. The record also established that Mall, or members of Mall's family, had ended up with title to other properties financed by Mall's companies in situations where Sziics was the builder and had been unable to complete the construction.
Sziics substantially stopped working on the Droege house in December of 1981. When Christiansen returned from New York in November of 1981, he discovered Sziics had misspent the Droege funds on other projects, taken materials from their project to others, and allowed liens to be filed against the property. He told Mall that Sziics was "shakey" and not to let him have any more money. He refused to have anything to do with the Droege deal, and was himself forced to cope with claimed misappropriations of funds and materials by Sziics on his own house. Finally, Droege comprehended what was going on. He ordered Sziics off the job in March of 1982.
Then the litigation began. Security filed its foreclosure suit on June 18, 1982. Various lien claimants were joined. The Droeges' cross-claimed against Sziics and Christiansen; both were served. Just prior to trial, the claim against Sziics was severed. The trial court ordered foreclosure of the mortgage, but it also gave the Droeges a money judgment for $49,705.90 against Christiansen. While the foreclosure was on appeal, Christiansen settled with the Droeges for $25,000, in cash.[3]
At the first foreclosure suit, it is clear that the $49,705.90 was composed of cash outlays that the Droeges had made, up to that point, to wit:

 Cash $31,000.00
 Lien Payoffs 4,900.00
 Misc. Expenses 473.90
 200.00
 138.00
 Cost Paid to Another Contractor
 to Complete Exterior walls and
 Roof to "Dry-In" the Structure. 12,994.00
 __________
 TOTAL $49,705.90

However, that judgment was not against Sziics, and that sum did not include all of the Droeges' damages for breach of the construction contract. The Droeges established at the second foreclosure trial that it will cost an additional $77,000 to complete the house, pursuant to the contract, and that they had spent a minimum of $21,000 in attorney fees to defend lien claims, and to defend and appeal the foreclosure suits.
Based on the evidence adduced at the second trial, the trial judge cancelled the note and mortgage on the ground that the note had not been funded; and he denied Security an equitable lien against the Droege property because there was no evidence of unjust enrichment. Since Security was not a holder in due course, and thus subject to any defenses available to the Droeges against Sziics and/or Christiansen, the record sufficiently established in this case that the mortgage note failed because of lack of consideration (a failure in this case to "fund" the $55,000 construction *802 loan)[4] and, taking a view of the evidence most favorable to the Droeges, Security did not prove that Sziics or even Security put any more materials and labor into the house in excess of the Droeges' original $31,000. A construction mortgage is essentially a mortgage to secure future advances, and the mortgagee assumes the duty to use reasonable care to see that the funds advanced are used to pay for the materials and supplies and work done on the job. 55 Am.Jur.2d Mortgages § 14 (1971); Kalbes v. California Federal Savings & Loan, 497 So.2d 1256 (Fla. 2d DCA 1986).
However, the issue on this appeal as presented by appellant, is whether the Droeges' pursuit of their cause of action against Christiansen for breach of the construction contract to judgment, and actual receipt of $25,000 in cash, waived or estopped them from asserting any defense relating to the construction of the house because of an election of remedies.
The doctrine of election of remedies is a technical rule of procedure or judicial administration, used by the courts to prevent double recoveries for a single wrong. 25 Am.Jur.2d Election of Remedies § 1 (1971). Application of the doctrine can serve as an instrument of injustice when an election of a remedy turns out to be unavailable, and yet it is held to bar pursuit of another remedy.[5] Prior to imposing the doctrine, courts should carefully consider the facts of each case. 25 Am.Jur.2d Election of Remedies § 3. See Williams v. Robineau, 124 Fla. 422, 168 So. 644 (1936).
If the two remedies are inconsistent or mutually exclusive, so that one implies negation of the underlying facts necessary for the other, then the mere choice of one remedy and certainly, pursuit of one remedy to judgment, operates as an election. 25 Am.Jur.2d Election of Remedies §§ 10-11 (1971); 1 Fla.Jur.2d Actions § 155 (1980); Villeneuve v. Atlas Yacht Sales, Inc., 483 So.2d 67 (Fla. 4th DCA 1986), approved, 505 So.2d 1331 (Fla. 1987); American Process Co. v. Florida White Pressed Brick Co., 56 Fla. 116, 47 So. 942 (1908); Bliss and Laughlin Industries, Inc. v. Malley, 364 So.2d 65 (Fla. 4th DCA 1978). However, if the remedies are concurrent or cumulative, and logically can coexist on the same facts, the doctrine of election does not apply until the injured party has received full satisfaction for his injuries. 25 Am.Jur.2d Election of Remedies § 12 (1971); 1 Fla.Jur.2d Actions § 156 (1980); Williams v. Robineau, supra; Klondike, Inc. v. Blair, 211 So.2d 41 (Fla. 4th DCA 1968). Or, if the remedies address different and distinct rights or readress different wrongs, the doctrine of election has no application. 25 Am.Jur.2d Election of Remedies §§ 10-11 (1971); Williams v. Robineau, supra; 1 Fla.Jur.2d Actions § 157 (1980).
In this case, the remedy of cancelling a mortgage because of failure of consideration or funding is not factually inconsistent with a breach of contract suit against a contractor for failure to build. Had this foreclosure suit been brought by Sziics, rather than Security, the Droeges would not have been put to an election to select one remedy over the other. A mortgage which fails for lack of consideration is a nullity, and in the hands of the original mortgagee or non-holder in due course, it cannot be enforced or foreclosed. Normally, cancellation of a mortgage for failure of consideration appears to be an independent or distinct remedy from a suit for breach of the construction contract. Here, however, failure of consideration (failure to build) was bound up with the consideration for the mortgage.
*803 At best, the remedy in this case was alternative and concurrent, and thus no estoppel or waiver applies until the Droeges' injuries are satisfied in full and then, the mortgage should only be enforced pro tanto  the fair value of the benefit received by the mortgagor. Johnson v. Dichiara, 84 So.2d 537 (Fla. 1955). The Droeges in fact received only $25,000 from Christiansen. Droege still has the right to sue Sziics for breach of contract since his suit against Sziics was severed from the first trial, and Sziics is bound in no way by the judgment against Christiansen.
Droege's damages for Sziics' failure to complete the house is the difference between the contract price  $85,000  and the sums necessary to complete the house ($77,000) plus related expenses incurred by Droege outside the perimeter of the contract, caused by Sziics' defalcations such as legal fees ($21,000) and cash outlays ($18,705.90), totalling $116,705.90.[6] This total is in addition to the $49,705.90 in cash outlay by the Droeges proved in the first foreclosure suit. Receipt of $25,000 in cash from Christiansen in no way "satisfied" the damages suffered by the Droeges at the hands of Sziics. Nor was there any proof that Droege received any unjust enrichment or benefit from Sziics and/or Security. He has expended, to date, $70,705.90 on this building project; and he must expend $77,000 more to obtain the house which he contracted.
AFFIRMED.
DOWNEY and WALDEN, JJ., concur.
NOTES
[1] Droege v. Security & Investment Corporation of Palm Beaches, 468 So.2d 539 (Fla. 4th DCA 1985).
[2] Although not relevant to the resolution of the issues in this case, apparently Carlene Droege became so distraught over the lawsuits and their inability to get their home completed, she committed suicide between the time this court heard the first appeal and the second foreclosure trial in 1987.
[3] From a deposition of Christiansen included in the record, Christiansen had no property or assets in his sole name, although several properties were owned solely by his wife.
[4] Vol. 1A Boyer's Florida Real Estate Transaction, § 32.08; 59 C.J.S. Mortgages § 87; Kremser v. Tonokaboni, 356 So.2d 1331 (Fla. 3d DCA 1978). An alternative theory to sustain the trial judge is that the mortgage note never became due because it was modified by the construction contract, which provided the installment payments were not due until the construction was complete. See 59 C.J.S. Mortgages § 156; 456; 506.
[5] 25 Am.Jur.2d Election of Remedies § 3. See Barbe v. Villeneuve, 505 So.2d 1331 (Fla. 1987) and Coronet Kitchens, Inc. v. Mortgage Mart, Inc., 146 So.2d 768 (Fla. 2d DCA 1962).
[6] These costs are above and beyond the $31,000 paid by Droege pursuant to the contract.